UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| **SIERRA CLUB** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Cause No. 2:19-cv-337 |
| | ) | |
| **BP PRODUCTS NORTH AMERICA INC.,** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**DEFENDANT BP PRODUCTS NORTH AMERICA INC.'S ANSWER TO PLAINTIFF'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

For its Answer to Plaintiff's Complaint for Declaratory and Injunctive Relief, Defendant BP Products North America Inc. ("Whiting") respectfully state as follows:

**STATEMENT OF THE CASE**

1.      This is a citizen enforcement suit brought by Hoosier Chapter of the Sierra Club, a non-profit environmental organization, on behalf of its individual members, to redress and prevent repeated and ongoing Clean Air Act violations that negatively affect the health and lives of residents of the State of Indiana and adjacent communities in northeastern Illinois by exposing them to harmful air pollutants on a regular basis.

**ANSWER:     Paragraph 1 contains no allegations against Defendant. To the extent paragraph 1 asserts allegations against Defendant, those allegations are denied.**

2.      Defendant BP Products North America, Inc. ("BP") owns and operates the Whiting Refinery, located at 2815 Indianapolis Boulevard, in the City of Whiting, Lake County, Indiana 46394.

**ANSWER:     Admitted.**

1

3.      BP has repeatedly violated, is violating, and will continue to violate the federal Clean Air Act, 42 U.S.C. § 7401 *et seq*., the Indiana State Implementation Plant ("SIP"), and the Whiting Refinery's Clean Air Act Title V operating permit at the Whiting Refinery.

**ANSWER:    Denied.**

4.      BP's violations include repeatedly emitting particulate matter consisting of particles 10 microns or smaller in diameter ("$PM_{10}$") from five large steam-producing boilers in excess of numeric emissions limitations required under the Indiana SIP and its Title V operating permit, and failing to conduct required retests following "stack tests"[1] that demonstrated noncompliance.

**ANSWER:    Denied.**

5.      Plaintiff is unaware of any actions taken by Defendant that are sufficient to eliminate future violations of the types alleged in Counts I through III, and absent an appropriate order from this Court, Defendants will continue to violate the Act as described in Counts I through III. Plaintiff intends this action to encompass any post-Complaint violations of the types alleged in Counts I through III.

**ANSWER:    Paragraph 5 contains no allegations against Defendant. To the extent paragraph 5 asserts allegations against Defendant, those allegations are denied.**

6.      Neither the federal nor the government of Indiana has taken enforcement action or other regulatory action sufficient to prevent BP from violating the Act at Whiting Refinery.

**ANSWER:    Denied.**

7.      Pursuant to the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604, Plaintiff Sierra Club files this complaint seeking declaratory and injunctive relief to remedy BP's violations

---

[1] "Stack tests," which are sometimes also referred to as "performance tests," are periodic tests designed to measure emissions of specific regulated pollutants, and the efficiency of any associated control devices used to reduce emissions at facilities subject to the requirements of the Clean Air Act.

of federally enforceable emissions limitations, including the installation of air pollution control devices or operating methods, the assessment of civil penalties for violations of federally enforceable emissions limits and testing requirements enumerated in this Complaint, environmental projects to offset or mitigate the harm caused by illegal emissions, and recovery of Plaintiff's reasonable fees and costs.

**ANSWER:   Paragraph 7 contains no allegations against Defendant. To the extent paragraph 7 asserts allegations against Defendant, those allegations are denied.**

**The Citizen Suit Provision of the Clean Air Act**

8.     The declared purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

**ANSWER:   The law speaks for itself. To the extent paragraph 8 asserts allegations against Defendant, those allegations are denied.**

9.     In the "citizen suit" provision of the Act, Congress authorized "any person," upon providing a 60-day notice of intent, to commence a civil action on his own behalf "against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 42 U.S.C. § 7604(a)(1).

**ANSWER:   The law speaks for itself. To the extent paragraph 9 asserts allegations against Defendant, those allegations are denied.**

10.    Congress enacted the citizen suit provision "specifically to encourage citizen participation in the enforcement of standards and regulations established under this Act . . . and intended the section to afford [citizens] very broad opportunities to participate in the effort to

3

prevent and abate air pollution." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986), *supplemented*, 483 U.S. 711 (1987) (internal citations omitted).

**ANSWER:   The case speaks for itself. To the extent paragraph 10 asserts allegations against Defendant, those allegations are denied.**

11.     Accordingly, the provision adopts a broad definition of "emission standard or limitation" which includes, *inter alia*: any "schedule or timetable of compliance, emissions limitation, standard of performance or emission standard . . . any other standard, limitation, or schedule established under any permit issued pursuant to [Title V] of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f).

**ANSWER:   The law speaks for itself. To the extent paragraph 11 asserts allegations against Defendant, those allegations are denied.**

12.     The citizen suit provision grants federal district courts jurisdiction "to enforce such an emission standard or limitation, or such an order," by issuing a declaratory judgment, providing injunctive relief, imposing any appropriate civil penalties, and through any other equitable relief as the Court may deem just and proper. 42 U.S.C. § 7604(a).

**ANSWER:   The law speaks for itself. To the extent paragraph 12 asserts allegations against Defendant, those allegations are denied.**

13.     In issuing any final order in an action brought under the citizen suit provision, a court may also "award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." 42 U.S.C. § 7604(d).

**ANSWER:   The law speaks for itself. To the extent paragraph 13 asserts allegations against Defendant, those allegations are denied.**

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. § 7604(a) of the Clean Air Act, and 28 U.S.C. § 1331 (federal question jurisdiction).

**ANSWER:    Admitted.**

15.     The relief requested is authorized pursuant to 42 U.S.C. § 7604 and 28 U.S.C. §§ 2201-2202.

**ANSWER:    The law speaks for itself. To the extent paragraph 15 asserts allegations against Defendant, those allegations are denied.**

16.     This Court is the proper venue for this action because Whiting Refinery is located within this judicial district. 42 U.S.C. § 7604(c)(1); *see also* 28 U.S.C. § 1391(e) (federal venue provision).

**ANSWER:    Defendant admits that venue is proper under 42 U.S.C. § 7604(c)(1) and 28 U.S.C. § 1391(e) because the Site that is the subject of the action is situated within the territorial limits of this District and Division. To the extent paragraph 16 asserts any other allegations against Defendant, those allegations are denied.**

## NOTICE

17.     On February 22, 2019, Plaintiff served all necessary parties, including Defendant, the United States Environmental Protection Agency ("EPA"), and the State of Indiana, with written notice of the claims stated in this action via U.S. Postal Service certified mail, in accordance with the notice requirements of 42 U.S.C. § 7604(b)(1)(A) and 40 C.F.R. § 54.2. *See generally* Notice of Intent to Sue Letter (February 22, 2019) ("NOI"), Ex. 1; Certified Mail Return Receipts and Delivery Confirmation for NOI, Ex. 2.

**ANSWER:    Defendant, as to itself, admits receiving an email containing the NOI described on February 25, 2019, with service of the NOI via U.S Postal Service certified**

mail made after February 25, 2019. As to the service of other parties, Defendant lacks sufficient information to admit or deny paragraph 17, and therefore denies same.

18.     In accordance with the requirements of the Clean Air Act's citizen suit provision and its implementing regulations, this notice letter included information sufficient to permit Defendant to identify the specific standards, limitations, or orders alleged to have been violated, the activities alleged to be in violation, the person(s) responsible for the alleged violations, the location of the alleged violations, the likely dates of said violations, and the full names and addresses of the persons giving notice. 42 U.S.C. § 7604(b)(1)(A); 40 C.F.R. § 54.3.

ANSWER:     **Both the notice letter described and the cited law speak for themselves. To the extent paragraph 18 asserts allegations against Defendant, those allegations are denied.**

19.     Pursuant to the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604(c)(3), Plaintiff has served a copy of the Complaint simultaneously upon the Attorney General of the United States and the EPA Administrator.

**ANSWER:     Both the notice letter described and the cited law speak for themselves.   As to the actions of those other than itself, Defendant lacks sufficient information to admit or deny paragraph 19, and therefore denies same.**

20.     More than sixty days have elapsed since Plaintiff served the required notice. 42 U.S.C. § 7604(b)(1)(A).

ANSWER:     **Defendant admits more than sixty days have elapsed since Plaintiff served the notice letter on Defendant. As to the service on other parties, Defendant lacks sufficient information to admit or deny paragraph 20, and therefore denies same.**

## PARTIES

21.     Plaintiff Sierra Club is a national nonprofit organization with 67 chapters and about 780,000 members, including in Indiana, dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

ANSWER:     **Paragraph 21 contains no allegations against Defendant. To the extent paragraph 21 asserts allegations against Defendant, those allegations are denied.**

22.     The Sierra Club's concerns encompass protecting air quality and the adverse human health impacts associated with particulate matter pollution.

**ANSWER:     Paragraph 22 contains no allegations against Defendant. To the extent paragraph 22 asserts allegations against Defendant, those allegations are denied.**

23.     The Indiana Chapter of the Sierra Club, known as the Hoosier Chapter, is headquartered in Indianapolis, Indiana and has approximately 10,300 members. Several members of the Hoosier Chapter live, and own or rent property, in close proximity to the Whiting Refinery, are exposed to and adversely affected by the particulate matter emissions from Whiting Refinery alleged in this Complaint, and would ordinarily have standing to sue in their own right.

**ANSWER:     Paragraph 23 contains no allegations against Defendant. To the extent paragraph 23 asserts allegations against Defendant, those allegations are denied.**

24.     Sierra Club is a "person" within the meaning of 42 U.S.C. § 7602(e). As such, Plaintiff may commence a civil action under 42 U.S.C. § 7604(a).

7

**ANSWER:   The law speaks for itself. To the extent paragraph 24 asserts allegations against Defendant, those allegations are denied.**

25.     Defendant's repeated and ongoing violations of the $PM_{10}$ emissions limitations and testing requirements imposed by both the Indiana SIP and its Title V operating permit have injured and continue to injure the interests of Plaintiff and its members.

**ANSWER:   Denied.**

26.     BP Products North America Inc., a subsidiary of BP p.l.c., is the legal owner and operator of the Whiting Refinery, is in control of day to day operations, and is therefore a "person" as defined by the Clean Air Act who is responsible for the violations alleged herein.

**ANSWER:   BP p.l.c. owns BP Products North America Inc. through a series of corporate configurations; it is the only publicly held corporation that owns 10% or more of the stock of BP Products North America Inc. Defendant admits Paragraph 26's other allegations.**

## STATUTORY AND FACTUAL BACKGROUND

### Description of Whiting Refinery and the No. 3 Stanolind Power Station Boilers

27.     Whiting Refinery, which first began operating in 1889, is a massive oil refinery that encompasses approximately 1,400 acres off of the southwestern shore of Lake Michigan shoreline, across the three cities of Whiting, East Chicago, and Hammond, Indiana.[2]

**ANSWER:   Defendant admits that it began operating in 1889 and encompasses approximately 1,400 acres off the southwestern shore of the Lake Michigan shoreline, with portions of the refinery in the three municipalities of Whiting, East Chicago, and**

---

[2] BP p.1.c. "Whiting Refinery: Facility Fact Sheet." Accessed on August 21, 2019. Accessible at: https://www.bp.com/content/dam/bp-country/en_us/PDF/Asphalt/Whiting_Facility_Fact_Sheet.pdf

**Hammond, Indiana. To the extent paragraph 27 asserts additional allegations against Defendant, those allegations are denied.**

28.      Whiting Refinery is the largest refinery operated by BP anywhere in the world, the largest refinery in the American Midwest, and the 6th largest refinery in the United States. *Id*.

**ANSWER:      Admitted.**

29.      Per day, Whiting Refinery is capable of processing up to 430,000 barrels of crude oil, and producing over 15 million gallons of refined fuel products, such as gasoline, diesel fuel, and jet fuel.[3] Whiting Refinery accounts for almost 23% of BP's global crude distillation capacity.[4]

**ANSWER:      To the extent Paragraph 29 refers to or is based on information provided on the websites referenced in footnotes 3 and 4, the websites accessed as described speak for themselves. To the extent paragraph 29 asserts additional allegations against Defendant, those allegations are denied.**

30.      In 2012, BP received authorization for a significant expansion of Whiting BP Refinery, which modified many of the refinery's units in order to enable them to process North American crude oil, including heavy crude oil from the Canadian tar sands region.[5]

**ANSWER:      Defendant admits that, pursuant to the Clean Air Act, it obtained air permits related to the Whiting Refinery Modernization Project ("WRMP") between 2008 - 2012 from the Indiana Department of Environmental Management ("IDEM"), which authorized the construction of new emission units, modifications to existing emission units,**

---

[3] BP p.l.c. "Whiting Refinery." Last accessed on August 21, 2019. Accessible at: https://www.bp.com/en_us/united-states/home/where-we-operate/indiana/whiting-refinery.html
[4] BP p.l.c. "Whiting Refinery." Last accessed on August 21, 2019. Accessible at: https://www.bp.com/en_us/united-states/home/where-we-operate/indiana/whiting-refinery.html
[5] The International Brotherhood of Boilermakers. *Massive Whiting refinery upgrade goes online.* April 1, 2014. Accessible at: https://boilermakers.org/news/jobs/massive-whiting-refinery-upgrade-goes-online

and operational changes necessary for the WRMP. To the extent paragraph 30 asserts additional allegations against Defendant, those allegations are denied.

31.     This expansion project, known as the Whiting Refinery Modernization Project ("WRMP"), was completed on May 10, 2014. Whiting Refinery Title V Part 70 Permit, No. T089-38868-00453, issued January 29, 2018 ("2018 Title V Permit"), Section D.0.1.

**ANSWER:    Admitted.**

32.     Whiting Refinery's No. 3 Stanolind Power Station is comprised of five individual boilers (collectively, the "Boilers"), all of which burn refinery gas, natural gas, or liquefied petroleum gas in order to produce steam needed at process units throughout the plant. Each boiler is equipped with a conventional burner, a direct-fired duct burner, and a Select Catalytic Reduction ("SCR") system to control emissions of nitrogen dioxide. 2018 Title V Permit, Section D.24(x).

**ANSWER:    Admitted.**

33.     Each Boiler is rated at a maximum heat input capacity – which is a limit on the total amount of heat it can produce over a specific period of time – of 575 million British thermal units[6] ("mmBtu") per hour. *Id.*

**ANSWER:    Defendant admits that each Boiler has a rated maximum heat input capacity of 575 MMBtu/hr. To the extent Paragraph 33 asserts other allegations, including whether the maximum heat input capacity is a limit, those allegations are denied.**

34.     Boilers 31 and 32 were originally installed in 1948, Boilers 33 and 34 were installed in 1951, and Boiler 36 was installed in 1953. *Id.* From 2010 through 2012, each Boiler was modified to install their respective direct-fired duct burner. *Id.*

**ANSWER:    Admitted.**

---

[6] A British thermal unit is a unit of heat measurement that is defined as the amount of energy required to raise the temperature of one pound of water by one degree Fahrenheit.

35.     Each duct burner is rated at a maximum heat input capacity of 41 mmBtu/hr, equipped with low-NOx burners, and controlled by its Boiler's SCR system. *Id.*

**ANSWER:     Defendant admits each duct burner has a rated heat input capacity of 41 mmBtu/hr, is equipped with low-NOx burners, and is controlled by an SCR. To the extent paragraph 35 asserts other allegations against Defendant, including whether the maximum heat input capacity is a limit, those allegations are denied.**

36.     The combined emissions from each individual Boiler, its associated duct burner, and SCR system are released to the atmosphere from Stacks 503-01 through 503-05, respectively.

**ANSWER:     Admitted.**

**Applicable Boiler and Stack Emissions limitations and Standards**

37.     BP is required to limit emissions of $PM_{10}$ from each Boiler to no more than 0.0075 pounds per mmBtu ("lb/mmBtu") and 4.28 pounds per hour ("lb/hr"). 326 Ind. Admin. Code § 6.8-2-6(a); 2018 Title V Permit, Section D.24.1.

**ANSWER:     Both the law and permit speak for themselves. To the extent paragraph 37 asserts allegations against Defendant, those allegations are denied.**

38.     BP is separately required to limit $PM_{10}$ emissions from each Stack 503-01 through 503-05 to no more than 0.010 lb/mmBtu. 2018 Title V Permit, Section D.24.4(b)(2).

**ANSWER:     Both the law and permit speak for themselves. To the extent paragraph 38 asserts allegations against Defendant, those allegations are denied.**

39.     BP's Title V permit for the Whiting Refinery requires BP to perform a retest and demonstrate compliance no later than 180 days after the date of any test failing to demonstrate compliance with an applicable emissions limitation. 2018 Title V Permit, Section C.19(b).

**ANSWER:** **The permit speaks for itself. To the extent paragraph 39 asserts allegations against Defendant, those allegations are denied.**

40.     As explained further below, these $PM_{10}$ limitations and standards are federally enforceable through Indiana's Clean Air Act State Implementation Plan and BP's Title V permit, with compliance determined through periodic stack tests and other credible evidence.

**ANSWER:** **Both the law and permit speak for themselves. To the extent paragraph 40 asserts allegations against Defendant, those allegations are denied.**

**The Clean Air Act and State Implementation Plans ("SIPs")**

41.     Under the Clean Air Act, EPA is required to establish National Ambient Air Quality Standards ("NAAQS") for a number of "criteria pollutants" such as particulate matter ("PM"). *See* 42 U.S.C. § 7409; *see also* 40 C.F.R., Part 50.

**ANSWER:** **The law speaks for itself. To the extent paragraph 41 asserts allegations against Defendant, those allegations are denied.**

42.     An area that meets the NAAQS for a particular criteria pollutant is classified as an "attainment" area for that pollutant, while an area that does not meet the NAAQS is a "nonattainment" area. *See* 42 U.S.C. § 7407(d)(1).

**ANSWER:** **The law speaks for itself. To the extent paragraph 42 asserts allegations against Defendant, those allegations are denied.**

43.     Under the Clean Air Act's scheme of cooperative federalism, each State retains "primary responsibility for assuring air quality within the entire" State, and must adopt and submit to EPA for approval a "State implementation plan," or "SIP" – a set of state laws and regulations which will "specify the manner in which" NAAQS "will be achieved and maintained within each air quality control region in such State." 42 U.S.C. § 7407(a); *see also* 42 U.S.C. § 7410.

**ANSWER:    The law speaks for itself. To the extent paragraph 43 asserts allegations against Defendant, those allegations are denied.**

44.    Once a SIP is approved by EPA, it is published in the Code of Federal Regulations and becomes enforceable federal law. 42 U.S.C. § 7413; 40 C.F.R § 52.23.

**ANSWER:    The law speaks for itself. To the extent paragraph 44 asserts allegations against Defendant, those allegations are denied.**

45.    SIPs must specifically set forth requirements for permitting programs and implement emission standards and limitations that assure geographic areas either achieve, regain, or remain in attainment status. *See* 42 U.S.C. § 7410.

**ANSWER:    The law speaks for itself. To the extent paragraph 45 asserts allegations against Defendant, those allegations are denied.**

46.    Title V of the Clean Air Act also requires stationary sources to obtain and periodically renew operating permits which must incorporate all applicable requirements issued by a State under its SIP, any other federally enforceable requirements applicable to the source, and include continuous monitoring provisions to assure compliance. *Id.*

**ANSWER:    The law speaks for itself. To the extent paragraph 46 asserts allegations against Defendant, those allegations are denied.**

47.    Because compliance with permit terms and conditions is a vital component of NAAQS attainment and maintenance, violations of emissions limits and other requirements enumerated in Title V permits, or otherwise specified in a SIP, are independently enforceable violations under federal law.[7]

---

[7] *See* 326 IAC § 2-2-1(v), stating that federally enforceable limitations and conditions include all of the following: (1) requirements developed pursuant to 40 C.F.R. Part 60 and 40 C.F.R. Part 61; (2) requirements within the Indiana SIP; and (3) any permit requirements established pursuant to 40 C.F.R. Part 52.21 or 40 C.F.R. Part 51, Subpart I,

**ANSWER:   The law speaks for itself. To the extent paragraph 47 asserts allegations against Defendant, those allegations are denied.**

48.     Under 40 C.F.R. Part 81, a "nonattainment area" may be reclassified as having achieved "attainment" with a specific NAAQS, based on EPA's determination that it has met the relevant air quality standard. 42 U.S.C. § 7407(d)(3).

**ANSWER:   The law speaks for itself. To the extent paragraph 48 asserts allegations against Defendant, those allegations are denied.**

49.     Upon EPA's approval of re-designation, a State must revise its SIP to include additional measures to prevent backsliding into nonattainment, such as specific emissions limitations and standards "as may be necessary to ensure such maintenance." 42 U.S.C. § 7505a(a).

**ANSWER:   The law speaks for itself. To the extent paragraph 49 asserts allegations against Defendant, those allegations are denied.**

**<u>Prevention of Significant Deterioration and New Source Review</u>**

50.     The Clean Air Act also establishes the Prevention of Significant Deterioration ("PSD") program, which is intended to ensure all geographic areas remain in attainment status for NAAQS and requires all proposed new sources of air pollutants or modifications to existing stationary sources located in areas that are either in "attainment" or "unclassifiable" to apply for and receive a permit prior to the commencement of construction.[8]

---

"including operating permits issued under an EPA-approved program that is incorporated into the SIP and expressly requires adherence to any permit issued under the program."

[8] U.S. EPA. *Learn About New Source Review.* Accessed on August 21, 2019. Accessible at: https://www.epa.gov/nsr/learn-about-new-source-review 9 U.S. EPA. *Final Rule: Revisions to the National Ambient Air Quality Standards for Particulate Matter.* 52 Fed. Reg. 24,634, 24,663 (July 1, 1987).

**ANSWER:   Both the law and the U.S. EPA document referenced in footnote 8 speak for themselves. To the extent paragraph 50 asserts allegations against Defendant, those allegations are denied.**

51.   PSD rules include a requirement that existing sources determine whether a proposed physical or operational modification will increase emissions above certain "significant" threshold amounts. *Id*. Under PSD rules, States are also authorized, through their SIPs, to impose additional emissions limitations specific to individual sources that are designed to ensure that a new project's emissions remain below the PSD significance thresholds. *See* generally 326 IAC §§ 2-1.1-4, 2-2 and 2-3 (Indiana SIP provisions implementing PSD and New Source Review).

**ANSWER:   Both the law and the U.S. EPA document referenced in footnote 8 speak for themselves. To the extent paragraph 51 asserts allegations against Defendant, those allegations are denied.**

52.   While States determine the project-specific limitations applicable under these programs, once implemented these limitations become independently enforceable federal requirements under the Clean Air Act.

**ANSWER:   The law speaks for itself.   To the extent paragraph 52 asserts allegations against Defendant, those allegations are denied.**

**Particulate Matter Emissions and NAAQS**

53.   Particulate matter ("PM") is a mixture of small particles, including organic materials, metals, and ash, which can cause significant health and environmental problems.

**ANSWER:   Paragraph 53 contains no allegations against Defendant. To the extent paragraph 53 asserts allegations against Defendant, those allegations are denied.**

54.   Extensive peer-reviewed studies have demonstrated concrete links from human exposure to PM to serious health risks, such as respiratory issues, heart attacks, irregular

heartbeat, aggravated asthma, cancer, and premature death in individuals with heart or lung disease.[9]

**ANSWER:**    **Paragraph 54 contains no allegations against Defendant, and the U.S. EPA document referenced in footnote 9 speaks for itself. To the extent paragraph 54 asserts allegations against Defendant, those allegations are denied.**

55.     In part due to these significant health risks, EPA has designated PM as a criteria pollutant pursuant to 42 U.S.C. § 7410.

**ANSWER:**    **The law speaks for itself. To the extent paragraph 55 asserts allegations against Defendant, those allegations are denied.**

56.     EPA has not identified any truly "safe" level of exposure to PM, and health risks generally increase in proportion to increases in PM pollution.[10]

**ANSWER:**    **Paragraph 56 contains no allegations against Defendant, and the U.S. EPA document referenced in footnote 10 speaks for itself. To the extent paragraph 56 asserts allegations against Defendant, those allegations are denied.**

57.     While exposure to PM of any size can present health risks, particle size is directly related to the potential for causing health problems. Fine particulates 2.5 microns or smaller in diameter ("PM$_{2.5}$") – which are so small as to be undetectable without an electron microscope – pose the greatest risks due to their ability to penetrate deep into the lungs and enter the bloodstream.

**ANSWER:**    **Paragraph 57 contains no allegations against Defendant. To the extent paragraph 57 asserts allegations against Defendant, those allegations are denied.**

---

[9] U.S. EPA. *Final Rule: Revisions to the National Ambient Air Quality Standards for Particulate Matter.* 52 Fed. Reg. 24,634, 24,663 (July 1, 1987).
[10] U.S. EPA. *Particle Pollution and Health Fact Sheet.* (2012). Accessible at: https://www.epa.gov/sites/production/files/2016-04/documents/health_2012_factsheet.pdf

58.     Due to the increasing severity of health risks associated with smaller sizes of PM, for regulatory purposes EPA distinguishes between categories of PM based on size, and has established separate NAAQS specifically for (1) PM of all sizes, (2) $PM_{10}$, and (3) $PM_{2.5}$ (which is also included within $PM_{10}$).[11]

**ANSWER:     Paragraph 58 contains no allegations against Defendant, and the U.S. EPA document referenced in footnote 11 speaks for itself. To the extent paragraph 58 asserts allegations against Defendant, those allegations are denied.**

59.     PM emissions consist of both "filterable" PM, which is directly emitted by a source in solid or liquid form, and "condensable" PM, emissions which are initially in vapor phase, but condense in the ambient air immediately after discharge to form solid or liquid PM.[12]

**ANSWER:     Paragraph 59 contains no allegations against Defendant, and the U.S. EPA document referenced in footnote 12 speaks for itself. To the extent paragraph 59 asserts allegations against Defendant, those allegations are denied.**

60.     Filterable PM can be composed of PM of any size. Condensable PM emissions are gaseous and composed of particulates 1 micron or smaller in diameter, and are therefore included within both $PM_{10}$ and $PM_{2.5}$. BP's stack test results show that more than half of the total $PM_{10}$ emitted from the 3SPS Boilers and Stacks is in condensable form.

**ANSWER:     Paragraph 60 contains no allegations against Defendant. To the extent paragraph 60 asserts allegations against Defendant, those allegations are denied.**

---

[11] U.S. EPA. *Final Rule: National Ambient Air Quality Standards for Particulate Matter.* 78 Fed. Reg. 3086 (January 15, 2013).
[12] Stephen D. Paige, Director, EPA Office of Air Quality Planning and Standards. *Memorandum re: Interim Guidance on the Treatment of Condensable Particulate Matter Test Results in the Prevention of Significant Deterioration and Nonattainment New Source Review Permitting Programs.* (April 8, 2014). At pages 2-3. Accessible at: https://www3.epa.gov/ttnemc01/methods/psdnsrinterimcmpmemo4814.pdf

61.     EPA has found substantial evidence of serious health effects associated with short and long-term exposure to $PM_{2.5}$, even in areas that are in attainment for $PM_{10}$ NAAQS.[13]

**ANSWER:     Paragraph 61 contains no allegations against Defendant, and the U.S. EPA document referenced in footnote 13 speaks for itself. To the extent paragraph 61 asserts allegations against Defendant, those allegations are denied.**

62.     EPA's 2018 Technical Support Document for calculating benefits-per-ton for criteria pollutants emitted from certain industrial categories estimates that in 2020, each ton of $PM_{2.5}$ released from refineries will result in public health costs of between \$360,000 to \$830,000 due to higher mortality and morbidity rates.[14]

**ANSWER:     Paragraph 62 contains no allegations against Defendant, and the U.S. EPA document referenced therein and in footnote 14 speaks for itself. To the extent paragraph 62 asserts allegations against Defendant, those allegations are denied.**

63.     In 2018, Lake County's $PM_{2.5}$ NAAQS classification was re-designated from "unclassifiable" to "unclassifiable/attainment."[15]

**ANSWER:     Paragraph 63 contains no allegations against Defendant, and the U.S. EPA document referenced in footnote 15 speaks for itself. To the extent paragraph 63 asserts allegations against Defendant, those allegations are denied.**

64.     In 2003, Lake County was re-designated from a "nonattainment" area to a "moderate maintenance" area for the $PM_{10}$ NAAQS.[16]

---

[13] U.S. EPA. *Final Report: Integrated Science Assessment for Particulate Matter*. (December 2009), at pgs. 1-5, 2-8 to 2-22. Accessible at: http://ofmpub.epa.gov/eims/eimscomm.getfile?p_download_id=494959

[14] U.S. EPA, Office of Air and Radiation. *Technical Support Document: Estimating the Benefit Per Ton of Reducing $PM_{2.5}$ Precursors from 17 Sectors*. (February 2018), Table 7, pg. 16. Accessible at: https://www.epa.gov/sites/production/files/2018-02/documents/sourceapportionmentbpttsd_2018.pdf

[15] *See* U.S. EPA. *Final Rule: Air Plan Approval; Illinois; Indiana; Revised Designation of Illinois and Indiana 2012 $PM_{2.5}$ Unclassifiable Areas*. 83 Fed. Reg. 66631 (December 27, 2018).

[16] *See* U.S. EPA. *Direct Final Rule: Redesignation and Approval and Promulgation of Indiana Implementation Plans*. 68 Fed. Reg. 1370 (Jan. 10, 2003).

**ANSWER:    Paragraph 64 contains no allegations against Defendant, and the U.S. EPA document referenced in footnote 16 speaks for itself. To the extent paragraph 64 asserts allegations against Defendant, those allegations are denied.**

**Applicable Clean Air Act Requirements at Whiting Refinery**

65.    BP is subject to specific $PM_{10}$ emissions limitations in the Indiana SIP that were designed and implemented to ensure that Lake County remains in attainment for $PM_{10}$ NAAQS.

**ANSWER:    Both the Indiana SIP and law speak for themselves. To the extent paragraph 65 asserts allegations against Defendant, those allegations are denied.**

66.    Specifically, Indiana SIP provision 326 IAC § 6.8-2-6(a), entitled "BP Products North America, Inc.-Whiting Refinery" establishes source-specific $PM_{10}$ emissions limitations for individual units at Whiting Refinery, including the limits for each individual 3SPS Boiler. ¶ 37.

**ANSWER:    Both the Indiana SIP and law speak for themselves. To the extent paragraph 66 asserts allegations against Defendant, those allegations are denied.**

67.    Per Indiana's SIP, any requirements or emissions limitations established in a Title V operating permit are independently enforceable federal requirements, regardless of whether such limits are included in the SIP. *See* 326 IAC § 2-2-1(v)(1)-(3); *see also* 326 IAC § 2-1.1-4(a).

**ANSWER:    Both the Indiana SIP and law speak for themselves. To the extent paragraph 67 asserts allegations against Defendant, those allegations are denied.**

68.    In addition to being enforceable requirements of the Indiana SIP, the Boiler emissions limitations have also been explicitly incorporated as requirements of each of BP's

federally enforceable Title V, Part 70 operating permits for the BP Whiting Refinery issued by IDEM since 2012 to present. 2018 Title V Permit, Section D.24.1.[17]

**ANSWER:    Both the Indiana SIP and permits speak for themselves. To the extent paragraph 68 asserts allegations against Defendant, those allegations are denied.**

69.    Section D.24.1 of the 2018 Title V Permit establishes that these Boiler emissions limitations are specific to the Boilers, and do not apply to emissions from their associated duct burners or SCR systems. *Id.*; *see also* 326 IAC § 6.8-2-6(a).

**ANSWER:    Both the law and permit speak for themselves. To the extent paragraph 69 asserts allegations against Defendant, those allegations are denied.**

70.    Defendant's Title V operating permit for the Whiting Refinery also includes an additional limit that applies to the combined $PM_{10}$ emissions from each individual Stack 503-01 through 503-05. ¶ 38; *see also* 2018 Title V Permit, Section D.24.4(b)(2).[18]

**ANSWER:    Both the law and permit speak for themselves. To the extent paragraph 70 asserts allegations against Defendant, those allegations are denied.**

71.    Section D.24.4(b)(2) explicitly states BP accepted this Stack emissions limit in order to render the more stringent "major" PSD requirements not applicable to Whiting Refinery.

**ANSWER:    Both the law and permit speak for themselves. To the extent paragraph 71 asserts allegations against Defendant, those allegations are denied.**

72.    The PSD significance threshold for $PM_{10}$ is 15 tons of emissions per year, while the significance threshold for $PM_{2.5}$ is 10 tons per year. 40 C.F.R. § 52.21(b)(23)(i).

---

[17] Because the applicable emissions limitations and standards have remained unchanged between permit iterations, the remainder of this Complaint will cite the relevant provisions from the currently operative 2018 Title V Permit. However, the 0.0075 lb/mmBtu and 4.28 lb/hr Boiler emissions limitations can be found in Section D.24.1.1 of the 2012 Title V Permit, and Section D.24.1. of the 2015, 2016, and 2018 Title V Permits.

[18] The 0.010 lb/mmBtu Stack emissions limitation may be found in Section D.24.4(b)(3) of the 2012 and 2015 Title V Permits, and Section D.24.4(b)(2) of the 2016 and 2018 Title V Permits.

**ANSWER:** The law speaks for itself. To the extent paragraph 72 asserts allegations against Defendant, those allegations are denied.

**Requirements for Stack Testing and Demonstrating Compliance at Whiting Refinery**

73. Pursuant to 42 U.S.C. § 7413(e)(2), EPA's 1991 Clean Air Act Stationary Source Civil Penalty Policy states that violations are "assumed to be continuous from the first   provable date of violation until the source demonstrates compliance." *See* U.S. EPA, Clean Air Act Stationary Source Civil Penalty Policy (October 25, 1991) (excerpted), Ex. 3, pgs. 2-3 (emphasis added); *e.g., Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 708 (7th Cir. 2011) (noting "the Clean Air Act imposes strict liability from the first day of the offense.").

**ANSWER:** The law, U.S. EPA document, and case speak for themselves. To the extent paragraph 73 asserts allegations against Defendant, those allegations are denied.

74. The Act further defines "emissions limitations" and "emission standards" to mean any requirement "which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction and any design, equipment, work practice or operational standard promulgated under this chapter." 42 U.S.C. § 7602(k) (emphasis added).

**ANSWER:** The law speaks for itself. To the extent paragraph 74 asserts allegations against Defendant, those allegations are denied.

75. EPA's Stack Testing Guidance states that for a source to demonstrate "continuous compliance" with an emissions limit, "any stack test that is conducted . . . must demonstrate that a facility is capable of complying with the applicable emissions standards at all times." (emphasis added). *See* U.S. EPA, Clean Air Act National Stack Testing Guidance (April 27, 2009) (excerpted), Ex. 4, pg. 2 (citing 42 U.S.C. § 7602(k)); *see also* EPA, Definition of "Continuous Compliance" and Enforcement of O&M Violations (June 24, 1982) ("sources are

required to meet, without interruption, all applicable emissions limitations and other control requirements[.]").

**ANSWER:   The guidance documents speak for themselves. To the extent paragraph 75 asserts allegations against Defendant, those allegations are denied.**

76.     Both EPA and IDEM guidance emphasize that all stack tests must be conducted under representative operating conditions. Ex 4, pgs. 2-3; IDEM Stack Test Guidance (excerpted), Ex. 5, pg. 2; *see also* 40 C.F.R. § 60.8(c) (stating all "[p]erformance tests shall be conducted under such conditions as the Administrator shall specify to the plant operator based on representative performance of the affected facility") (emphasis added).

**ANSWER:   Both the law and guidance documents speak for themselves. To the extent paragraph 76 asserts allegations against Defendant, those allegations are denied.**

77.     326 IAC § 6.8-2-6(d) specifically states that the Boiler $PM_{10}$ emissions limitations apply to both filterable and condensable $PM_{10}$ emissions.

**ANSWER:   The law speaks for itself. To the extent paragraph 77 asserts allegations against Defendant, those allegations are denied.**

78.     Indiana's SIP explicitly requires BP to demonstrate compliance with the $PM_{10}$ Boiler emissions limitations through periodic stack testing, performed in accordance with the EPA Methods and procedures set forth in 40 C.F.R. Part 60. 326 IAC § 6.8-1-3.

**ANSWER:   The Indiana SIP speaks for itself. To the extent paragraph 78 asserts allegations against Defendant, including whether periodic stack testing is requested, those allegations are denied.**

79.     326 IAC § 6.8-2-6(d) further states that the total quantity of filterable $PM_{10}$ emissions "shall be determined in accordance with" either EPA Method 201A or Method 5, and the total quantity of condensable PM emissions shall be determined using EPA Method 202. *Id.*

**ANSWER:   The law speaks for itself. To the extent paragraph 79 asserts allegations against Defendant, those allegations are denied.**

80.     326 IAC § 6.8-2-6(d) states that alternatives to these Methods may be used only if they are approved in writing by EPA prior to a stack test.

**ANSWER:   The law speaks for itself. To the extent paragraph 80 asserts allegations against Defendant, those allegations are denied.**

81.     Section D.24.11(b) of the 2018 Title V Permit states that in order to demonstrate compliance with the Stack emissions limitation in Section D.24.4, BP "shall perform PM and $PM_{10}$ testing" of each individual Stack "at least once every 5.0 years from the date of the most recent valid compliance demonstration."

**ANSWER:   The permit speaks for itself. To the extent paragraph 81 asserts allegations against Defendant, those allegations are denied.**

82.     Section D.24.11(b) further provides that all stack tests must be conducted in accordance with 326 IAC § 3-6 and the federal stack testing standards of 40 C.F.R., Part 60, and that the Stack emissions limit explicitly includes the sum of both filterable and condensable $PM_{10}$.

**ANSWER:   Both the law and permit speak for themselves. To the extent paragraph 82 asserts allegations against Defendant, those allegations are denied.**

83.     Per these standards and their implementing guidance, upon a failed stack test, BP is out of compliance with its $PM_{10}$ limits until it successfully demonstrates compliance. ¶¶ 73-76.

**ANSWER:   Both the law and guidance speak for themselves. To the extent paragraph 83 asserts allegations against Defendant, those allegations are denied.**

84.    Section C.19 of the 2018 Title V Permit, entitled "Actions Related to Noncompliance Demonstrated by a Stack Test," states that when "the results of a stack test . . . exceed the level specified in any condition of this permit," BP shall submit a description of its response actions to IDEM, OAQ, no later than seventy-five (75) days after the date of the test, and perform a retest to demonstrate compliance no later than 180 days after the date of the test.[19] ¶ 39.

**ANSWER:   The permits speak for themselves. To the extent paragraph 84 asserts allegations against Defendant, those allegations are denied.**

85.    BP remains in continuing violation of the testing requirement and the emissions limit until it successfully performs the required retest to demonstrate compliance. ¶¶ 73-76.

**ANSWER:   Denied.**

86.    The Clean Air Act provides that any person who violates any such emission standard, limitation, or other permit condition or requirement may be assessed a civil penalty amount "per day for each violation." 42 U.S.C. § 7413(b).

**ANSWER:   The law speaks for itself. To the extent paragraph 86 asserts allegations against Defendant, those allegations are denied.**

87.    Civil penalties are subject to a mandatory inflation adjustment under EPA's 2019 Civil Monetary Penalty Inflation Rule,[20] promulgated pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

---

[19] The requirement to retest can be found in Section C.19 of all four Title V permits.

[20] U.S. Environmental Protection Agency. *Final Rule: Civil Monetary Penalty Inflation Adjustment Rule*. 84 Fed. Reg. 2056, 2059 (Feb. 6, 2019).

**ANSWER:   Both the law and U.S. EPA document speak for themselves. To the extent paragraph 87 asserts allegations against Defendant, those allegations are denied.**

88.     Per these mandatory adjustments, which are codified in Tables 1 and 2 of 40 C.F.R. § 19.4, a defendant is liable for $37,500 per day, per violation of the Clean Air Act occurring from December 6, 2013 through November 2, 2015, and for $99,681 per day, per violation occurring after November 2, 2015. *See* 40 C.F.R. § 19.4.

**ANSWER:   Denied.**

**BP's Stack Test Results for PM$_{10}$ Emissions**

89.     Since August 2015, BP has performed 12 stack tests for PM$_{10}$ emissions at Stacks 503-01 through 503-05, to measure the combined emissions from a specific Boiler and its associated duct burner and SCR system.

**ANSWER:   Defendant admits it conducted the twelve stack tests referenced in Paragraph 92 below to measure the combined emissions from a specific Boiler and its respective duct burner and SCR system. To the extent paragraph 89 asserts additional allegations against Defendant, those allegations are denied.**

90.     For 10 of the 12 stack tests, BP reported total PM$_{10}$ emissions that exceeded the applicable Stack emissions limit of 0.010 lb/mmBtu. *See* Table 1, ¶¶ 92(a) – 92(l).

**ANSWER:   Defendant's reported stack test results speak for themselves. To the extent paragraph 90 asserts additional against Defendant, those allegations are denied.**

91.     IDEM determined 10 of these 12 stack tests demonstrated noncompliance with BP's applicable PM$_{10}$ emissions limits, and that compliance could not be determined for one of the stack tests. ¶¶ 92(a) – 92(k). IDEM has not yet issued a determination for one stack test. ¶ 92(l).

**ANSWER:**    **IDEM's compliance reviews, referenced in Paragraph 92 below, speak for themselves. To the extent paragraph 91 asserts allegations against Defendant, those allegations are denied.**

92.    The results of these stack tests are summarized in Table 1 below, along with notes of any accompanying IDEM reviews; each row is itemized as ¶¶ 92(a) – 92(l) of this Complaint.

**ANSWER:**    **Both IDEM's compliance reviews and Defendant's reported stack test results referenced throughout Paragraph 92 speak for themselves. To the extent paragraph 92 and its subparts assert allegations against Defendant, those allegations are denied.**

**Table 1**
**Summary of BP's Stack Test Results for the 0.010 lb/mmBtu Emission Limit**

| ¶ | Unit | Test Date | $PM_{10}$ Results (lb/mmBtu) | $PM_{10}$ Results (lb/hr) | Additional Notes |
|---|------|-----------|---------|---------|------------------|
| 92(a) | Stack 503-01 | 10/8/2018 | 0.0154 | 9.318 | IDEM found this test demonstrated noncompliance with **both** the Stack and Boiler $PM_{10}$ limits. |
| 92(b) | Stack 503-02 | 8/3/2015 | 0.0171 | 10.33 | IDEM found this test demonstrated noncompliance with **both** the Stack and Boiler $PM_{10}$ limits. |
| 92(c) | Stack 503-02 | 10/20/2015 | 0.0177 | 9.937 | IDEM found this test demonstrated noncompliance with **both** the Stack and Boiler $PM_{10}$ limits. |
| 92(d) | Stack 503-02 | 1/28/2016 | 0.0226 | 11 | IDEM found this test demonstrated noncompliance with **both** the Stack and Boiler $PM_{10}$ limits. |
| 92(e) | Stack 503-02 | 11/1/2016-11/2/2016 | 0.0047 (0.012) | 2.806 (7.13) | IDEM found BP failed to count sulfates as required, and found BP was out of compliance with **both** the Stack and Boiler $PM_{10}$ limits based on corrected results (in parentheses). |
| 92(f) | Stack 503-02 | 10/9/2018 | 0.0163 | 10.002 | IDEM found this test demonstrated noncompliance with **both** the Stack and Boiler $PM_{10}$ limits. |
| 92(g) | Stack 503-03 | 10/11/2018 | 0.0151 | 9.009 | IDEM found this test demonstrated noncompliance with **both** the Stack and Boiler $PM_{10}$ limits. |
| 92(h) | Stack 503-04 | 10/12/2018 | 0.0114 | 7.375 | IDEM found that compliance could not be determined on this test for either the Stack or Boiler $PM_{10}$ limits. |
| 92(i) | Stack 503-05 | 8/5/2015 | 0.0151 | 9.42 | IDEM found this test demonstrated noncompliance with **both** the Stack and Boiler $PM_{10}$ limits. |
| 92(j) | Stack 503-05 | 10/21/2015 | 0.0137 | 7.788 | IDEM found this test demonstrated noncompliance with **both** the Stack and Boiler $PM_{10}$ limits. |
| 92(k) | Stack 503-05 | 11/2/2016-11/3/2016 | 0.0079 (0.021) | 4.741 (12.95) | IDEM found BP failed to count sulfates as required, and found BP was out of compliance with **both** the Stack and Boiler $PM_{10}$ limits based on corrected results (in parentheses). |
| 92(l) | Stack 503-05 | 4/16/2019 | 0.0109 | 6.854 | No IDEM determination yet issued. |

93.     On October 10, 2017, BP performed a stack test at Boiler 32 which recorded an average $PM_{10}$ emissions rate of 0.0048 lb/mmBtu and 3.223 lb/hr from the Boiler only. ¶ 127.

**ANSWER:   Defendant admits that it conducted a test to measure $PM_{10}$ emissions from Boiler 32, upstream of the SCR, on October 10, 2017, and Defendant admits an average $PM_{10}$ emissions rate of 0.0048 lb/mmBtu and 3.223 lb/hr resulted from this test.  To the extent paragraph 93 asserts additional allegations against Defendant, those allegations are denied.**

94.     These 13 stack tests are the only stack tests BP has performed to measure $PM_{10}$ emissions from either the Boilers or the Stacks since August 3, 2015.

**ANSWER:   Defendant admits it has conducted the above-referenced thirteen stack tests to demonstrate compliance with the permitted $PM_{10}$ emission limits associated with these units: twelve tests to demonstrate compliance with the 0.010 lb/MMBtu limit, and one test to demonstrate compliance with the 0.0075 lb/MMBtu limit. Defendant denies any other allegations in paragraph 94 of the Complaint.**

**Any Credible Evidence May Be Used to Prove Violations of the Clean Air Act**

95.     In 1990, the Clean Air Act was explicitly amended to state that a violation may be "established by any credible evidence (including evidence other than the applicable test method)." 42 U.S.C.A. § 7413(e).

**ANSWER:   The law speaks for itself. To the extent paragraph 95 asserts allegations against Defendant, those allegations are denied.**

96.     Pursuant to § 7413(e), EPA's 1997 Credible Evidence Revisions rule ("Credible Evidence Rule") established that "EPA, States, and citizens" may "prosecute actions based exclusively on any credible evidence, without the need to rely on any data from a particular

reference test"[21] (emphasis added).

**ANSWER:    Both the law and U.S EPA document speak for themselves. To the extent paragraph 96 asserts allegations against Defendant, those allegations are denied.**

97.    The Rule notes that this clarification was necessary because evidence, including reports from the U.S. General Accounting Office and State pollution control agencies, indicated stack tests alone were often "inadequate to ensure that sources continuously stay within their emissions limits," due in part to their infrequency (typically once every 5 years). *Id.* at 8315.

**ANSWER:    Both the law and U.S EPA document speak for themselves. To the extent paragraph 97 asserts allegations against Defendant, those allegations are denied.**

98.    The Rule also noted EPA's further concern that stack tests may not always "yield a representative emissions picture because the sources typically schedule, set up and run the tests themselves," which "allows sources to 'fine tune' their operations and emissions control processes prior to tests, and generate results that may not be typical of day-to-day source operations." *Id.*

**ANSWER:    Both the law and U.S EPA document speak for themselves. To the extent paragraph 98 asserts allegations against Defendant, those allegations are denied.**

99.    Accordingly, the Credible Evidence Rule states that while "an appropriate and properly conducted test" using the applicable EPA method "will still generally be the best method for determining a source's compliance . . . Other emissions or parametric data, or engineering analyses, may be considered if relevant to the results that would have been obtained by the appropriate, properly conducted reference test methods." *Id.* at 8317.

**ANSWER:    Both the law and U.S EPA document speak for themselves. To the**

---

[21] U.S. EPA. *Final Rule: Credible Evidence Revisions.* 62 Fed. Reg. 8315-8316 (February 24, 1997). Accessible at: https://www.govinfo.gov/content/pkg/FR-1997-02-24/pdf/97-4196.pdf

extent paragraph 99 asserts allegations against Defendant, those allegations are denied.

100.    The Credible Evidence Rule states that "credible evidence" that can establish a source's noncompliance include, inter alia, "engineering calculations, indirect estimates of emissions . . . continuous emissions monitoring (CEM) data and well-chosen parametric monitoring data, such as the operating temperature and air flow rate" of a unit. *Id.* at 8315.

**ANSWER:    Both the law and U.S EPA document speak for themselves. To the extent paragraph 100 asserts allegations against Defendant, those allegations are denied.**

101.    Accordingly, 40 C.F.R. § 60.11(g) states that for the purpose of establishing whether or not a person has violated or is in violation of any standard in this part, "nothing in this part shall preclude the use, including the exclusive use, of any credible evidence or information, relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test or procedure had been performed."

**ANSWER:    The law speaks for itself. To the extent paragraph 101 asserts allegations against Defendant, those allegations are denied.**

102.    BP's Title V permit explicitly incorporates § 60.11(g) in full, and states that "any credible evidence or information" may be used to "establish[] whether or not the Permittee has violated or is in violation of any condition of this permit[.]" *See* 2018 Title V Permit, Section B.24.

**ANSWER:    The permit speaks for itself. To the extent paragraph 102 asserts allegations against Defendant, those allegations are denied.**

**BP's Annual Air Emission Statements for Whiting Refinery**

103.    While properly conducted stack tests using the applicable EPA test methods are generally the best method for determining compliance, as BP's 2018 Title V Permit explicitly reiterates, for the purpose of establishing a violation "nothing . . . shall preclude the use,

including the exclusive use, of any credible evidence or information relevant to whether the Permittee would have been in compliance with the condition of this permit if the appropriate performance or compliance test or procedure had been performed." *See* 2018 Title V Permit, Section B.24.

**ANSWER:   Both the law and permit speak for themselves.  To the extent paragraph 103 asserts allegations against Defendant, those allegations are denied.**

104.    Under Indiana's SIP, all stationary sources that are required to have a Title V operating permit must submit an annual emission statement to IDEM. *See* 326 IAC § 2-6. These annual emission statements must include a report of the estimated actual tons of criteria pollutants, including $PM_{10}$ and $PM_{2.5}$, emitted by the source over the previous calendar year, as well as operating data for each emission unit. 326 IAC § 2-6-4.

**ANSWER:   Both the Indiana SIP and law speak for themselves.  To the extent paragraph 104 asserts allegations against Defendant, those allegations are denied.**

105.    Emission statements must be signed by a responsible official for the source, who must also certify that all "information in the emission statement is accurate based on reasonable estimates using data available to the preparers and on a reasonable inquiry into records and persons responsible for the operation of the source, and is true, accurate, and complete." 326 IAC § 2-6-4(c).

**ANSWER:   The law speaks for itself.  To the extent paragraph 105 asserts allegations against Defendant, those allegations are denied.**

106.    BP submitted its Whiting Refinery Air Emission Statement for calendar year 2016 on June 27, 2017; for calendar year 2017 on June 28, 2018; and for calendar year 2018 on June 27, 2019. *See* Whiting Refinery Air Emission Statements for 2016-2018 (excerpted), Ex. 6.

Each Emission Statement separately reports the annual filterable $PM_{10}$ emissions ($PM_{10}$-FIL), condensable PM emissions (PM-CON), and heat input for each boiler and duct burner. Part B of each Emission Statement defines "PM-CON" as "Primary PM Condensible [sic] Only (All Less Than 1 Micron)," and $PM_{10}$-FIL as "Primary $PM_{10}$, Filterable Portion Only." *Id.*, pgs. 1, 7, 13.

**ANSWER:   Admitted.**

107.   Total $PM_{10}$ emissions for each Boiler are comprised of the sum of $PM_{10}$ filterable and condensable emissions, as required by the Indiana SIP and BP's Title V Permit. ¶¶ 77–79, 82.

**ANSWER:   Both the Indiana SIP and permit speak for themselves. To the extent paragraph 107 asserts allegations against Defendant, those allegations are denied.**

108.   Table 2 below presents the annual heat input and emissions of Total $PM_{10}$ (in tons per year) reported for each Boiler in the Emission Statements for 2016, 2017, and 2018; each row is itemized as ¶¶ 108(a) – 108(e) of this Complaint.

**ANSWER:   To the extent paragraph 108 and its subparts assert allegations against Defendant, those allegations are denied.**

**Table 2**
**Summary of 2016-2018 Air Emission Statements**

|  | Unit | Total $PM_{10}$ Emissions (tons/year) | | | Total Heat Input (mmBtu/year) | | |
|---|---|---|---|---|---|---|---|
|  |  | 2016 | 2017 | 2018 | 2016 | 2017 | 2018 |
| 108(a) | **Boiler 31** | 34.06 | 39.23 | 32.69 | 3,095,847 | 3,565,884 | 2,971,505 |
| 108(b) | **Boiler 32** | 40.9 | 11.65 | 8.81 | 2,748,324 | 3,697,950 | 2,797,136 |
| 108(c) | **Boiler 33** | 34.89 | 26.66 | 37.97 | 3,171,859 | 2,423,542 | 3,451,532 |
| 108(d) | **Boiler 34** | 39.93 | 35.55 | 39.03 | 3,630,566 | 3,232,491 | 3,548,332 |
| 108(e) | **Boiler 36** | 39.09 | 17.35 | 13.96 | 3,220,775 | 3,613,984 | 2,908,277 |

109.    In accordance with § 7413(e) of the Clean Air Act, the Credible Evidence Rule, and BP's Title V permit, these $PM_{10}$ emission and heat rate estimates, which were provided and certified by BP as required by Indiana's SIP, may be used as credible evidence of noncompliance with BP's $PM_{10}$ emissions limits during periods where no stack test data exists. ¶¶ 95 – 102.

**ANSWER:    Denied.**

110.    Annual emissions rates, in pounds per mmBtu, can be determined by dividing each unit's total annual emissions of $PM_{10}$ by said unit's reported total annual heat input (mmBtu).

**ANSWER:    Defendant admits the formula in Paragraph 110 is one way to calculate annual emission rates in pounds per mmBtu but denies that is the only way.**

111.    Annual emission rates, in pounds per hour, can be determined by dividing each unit's total annual $PM_{10}$ emissions by 8,760 hours (which is the total number of hours in a year).

**ANSWER:    Defendant admits the formula in Paragraph 111 is one way to calculate annual emission rates in pounds per hour but denies that it is the only way.**

112.    Table 3 presents annual emission rates in pounds per mmBtu and pounds per hour, based on the total annual $PM_{10}$ emissions and heat inputs reported for each Boiler in the Emission Statements for 2016, 2017, and 2018; each row is itemized as ¶¶ 112(a) – 112(e) of this Complaint. Highlighted text indicates a violation of the applicable Boiler $PM_{10}$ emissions limitation.

**ANSWER:    Paragraph 112 contains no allegations against Defendant. To the extent paragraph 112 and its subparts assert allegations against Defendant, those allegations are denied.**

32

**Table 3**
**2016-2018 Calculated Annual Boiler PM$_{10}$ Emissions Rates**

| ¶ | Unit | PM$_{10}$ Emissions Rate (lb/mmBtu) | | | PM$_{10}$ Emissions Rate (lb/hr) | | |
|---|---|---|---|---|---|---|---|
| | | 2016 | 2017 | 2018 | 2016 | 2017 | 2018 |
| 112(a) | **Boiler 31** | 0.0220 | 0.0220 | 0.0220 | 7.78 | 8.96 | 7.46 |
| 112(b) | **Boiler 32** | 0.0293 | 0.0063 | 0.0063 | 9.20 | 2.66 | 2.01 |
| 112(c) | **Boiler 33** | 0.0220 | 0.0220 | 0.0220 | 7.97 | 6.09 | 8.67 |
| 112(d) | **Boiler 34** | 0.0220 | 0.0220 | 0.0220 | 9.12 | 8.12 | 8.91 |
| 112(e) | **Boiler 36** | 0.0243 | 0.0096 | 0.0096 | 8.92 | 3.96 | 3.19 |

113.    Plaintiff understands that due to an error in reporting on the Emission Statements, Defendant may have intended to quantify estimated Boiler emissions based on an assumed annual emission rate of 0.010 lb/mmBtu. Even if correct, an emission rate of 0.010 lb/mmBtu exceeds the PM$_{10}$ emissions limit for each Boiler, which is 0.0075 lb/mmBtu.

**ANSWER:    Denied.**

**BP'S ALLEGED VIOLATIONS OF THE CLEAN AIR ACT**

114.    Plaintiff re-alleges and incorporates ¶¶ 1–113 by reference into each Count below.

**ANSWER:    Defendant re-pleads and incorporates all previous Answers as set forth in Paragraphs 1-113.**

115.    Each type of violation alleged in Counts I through III occurred more than once, and therefore was "repeated" within the meaning of 42 U.S.C. § 7604(a)(1).

**ANSWER:    The law speaks for itself. To the extent paragraph 115 asserts allegations against Defendant, those allegations are denied.**

**COUNT I:  Violations of PM$_{10}$ Emissions limits at Boilers 31 through 26**

116.    The Indiana SIP and BP's Title V permit require BP to limit emissions of PM$_{10}$ from each Boiler to no more than 0.0075 lb/mmBtu and 4.28 lb/hr PM$_{10}$. 326 IAC 6.8-2-6(a); 2018 Title V Permit, Section D.24.1.

**ANSWER:    Both the Indiana SIP and permit speak for themselves. To the extent paragraph 116 asserts allegations against Defendant, those allegations are denied.**

Boiler 31

117.    Based on the total annual heat input and PM$_{10}$ emissions reported by BP in its annual Emission Statements, annual PM$_{10}$ emission rates for Boiler 31 averaged 0.0220 lb/mmBtu in calendar years 2016, 2017, and 2018. ¶ 108(a), ¶ 112(a).

**ANSWER:    Denied.**

118.    Alternatively, to the extent that Whiting Refinery's annual Emission Statements for 2016, 2017, and 2018 are meant to reflect an assumed emission rate of 0.010 lb/mmBtu, Boiler 31 failed to comply with the PM$_{10}$ limit of 0.0075 lb/mmBtu in those years. ¶ 113.

**ANSWER:    Denied.**

119.    Based on credible evidence derived from BP's Emission Statements, BP violated the Boiler emissions limits at Boiler 31 on each day from January 1, 2016, until October 8, 2018.

**ANSWER:    Denied.**

120.    Based on the results of an October 8, 2018 stack test, IDEM determined that Boiler 31 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr PM$_{10}$ emissions limits. *See* October 8-12, 2018 Performance Test Reports for Boilers 31, 32, 33, and 34 (excerpted) & corresponding IDEM Office of Air Quality Compliance Memorandum (January 10, 2019), Ex. 7, pgs. 1-2 & 5-6; ¶ 92(a).

34

**ANSWER:    Both the Performance Test Reports and IDEM's compliance reviews speak for themselves. To the extent paragraph 120 asserts allegations against Defendant, those allegations are denied.**

121.    Each violation of the each of the 0.0075 lb/mmBtu and 4.28 lb/hr emissions limits is a separate violation of the Indiana SIP and Whiting Refinery's Title V operating permit.

**ANSWER:    The law, Indiana SIP, and permit speak for themselves.  To the extent paragraph 121 asserts allegations against Defendant, those allegations are denied.**

122.    Based on BP's stack test results and IDEM's findings, BP violated the Boiler emissions limits at Boiler 31 on each day from October 8, 2018, to the date of this filing. ¶ 92(a). These violations are ongoing.

**ANSWER:    Denied.**

<u>Boiler 32</u>

123.    Based on the results of an August 3, 2015 stack test, IDEM determined that Boiler 32 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. *See* Enforcement Referral Letter from Rick Massoels, IDEM Deputy Director of Northwest Regional Office, to Linda Wilson, BP Products North America, Inc. (April 8, 2016), Ex. 8; ¶ 92(b).

**ANSWER:    Both the stack test results and IDEM's compliance review speak for themselves.  To the extent paragraph 123 asserts allegations against Defendant, those allegations are denied.**

124.    Based on the results of a October 20, 2015 stack test, IDEM determined that Boiler 32 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. *See* October 20, 2015 Performance Test Report for Boiler 32 (excerpted) & corresponding IDEM Office of Air Quality Compliance Memorandum (July 25, 2016), Ex. 9, pgs. 1, 4; ¶ 92(c).

**ANSWER:   Both the Performance Test Report and IDEM's compliance review speak for themselves. To the extent paragraph 124 asserts allegations against Defendant, those allegations are denied.**

125.    Based on the results of a January 28, 2016 stack test, IDEM determined that Boiler 32 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. *See* January 28, 2016 Performance Test Report for Boiler 32 (excerpted) & corresponding IDEM Office of Air Quality Compliance Memorandum (June 1, 2016), Ex. 10, pgs. 1 & 3; ¶ 92(d).

**ANSWER:   Both the Performance Test Report and IDEM's compliance review speak for themselves. To the extent paragraph 125 asserts allegations against Defendant, those allegations are denied.**

126.    Based on the corrected results of 0.012 lb/mmBtu and 7.13 lb/hr for a November 1-2, 2016 stack test, IDEM determined that Boiler 32 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. *See* November 1-3, 2016 Performance Test Report for Boilers 32 and 36 (excerpted) & corresponding IDEM Office of Air Quality Compliance Memorandum (September 18, 2017), Ex. 11, pgs. 1 & 4; ¶ 92(e).

**ANSWER:   Both the Performance Test Report and IDEM's compliance review speak for themselves. To the extent paragraph 126 asserts allegations against Defendant, those allegations are denied.**

127.    Based on the results of an October 10, 2017 stack test, IDEM determined that Boiler 32 was in compliance with the 0.0075 lb/mmBtu and 4.28 lb/hr $PM_{10}$ emissions limits. *See* October 10, 2017 Performance Test Report for Boiler 32 (excerpted) & corresponding IDEM Office of Air Quality Compliance Memorandum (March 23, 2018), Ex. 12, pgs. 1 & 3; ¶  93.

**ANSWER:    Both the Performance Test Report and IDEM's compliance review speak for themselves. To the extent paragraph 127 asserts allegations against Defendant, those allegations are denied.**

128.    Based on the results of an October 9, 2018 stack test, IDEM determined that Boiler 32 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. Ex. 7, pgs. 2, 7-8 ; ¶ 92(f).

**ANSWER:    The law, Indiana SIP, and permit speak for themselves.  To the extent paragraph 128 asserts allegations against Defendant, those allegations are denied.**

129.    Each violation of the each of the 0.0075 lb/mmBtu and 4.28 lb/hr emissions limits is a separate violation of the Indiana SIP and Whiting Refinery's Title V operating permit.

**ANSWER:    Both Indiana SIP and permit speak for themselves. To the extent paragraph 129 asserts allegations against Defendant, those allegations are denied.**

130.    Based on BP's stack test results and IDEM's findings, BP violated the Boiler emissions limits at Boiler 32 on each day from August 3, 2015, to the date of this filing. These violations are ongoing. ¶¶ 92(b) – 92(f).

**ANSWER:    Denied.**

<u>Boiler 33</u>

131.    Based on the total annual heat input and $PM_{10}$ emissions reported by BP in its annual Emission Statements, annual $PM_{10}$ emission rates for Boiler 33 averaged 0.0220 lb/mmBtu in calendar years 2016, 2017, and 2018. ¶ 108(c), ¶ 112(c).

**ANSWER:    Denied.**

132.    Alternatively, to the extent that Whiting Refinery's annual Emission Statements for 2016, 2017, and 2018 are meant to reflect an assumed emission rate of 0.010 lb/mmBtu, Boiler 33 failed to comply with the $PM_{10}$ limit of 0.0075 lb/mmBtu in those years. ¶ 113.

**ANSWER:    Denied.**

133.    Based on credible evidence derived from BP's Emission Statements, BP violated the Boiler emissions limits at Boiler 33 on each day from January 1, 2016, until October 11, 2018. ¶ 108(c), ¶ 112(c).

**ANSWER:    Denied.**

134.    Based on the results of an October 11, 2018 stack test, IDEM determined that Boiler 33 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. Ex. 7, pgs. 3, 9-10; ¶ 92(g).

**ANSWER:    Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 134 asserts allegations against Defendant, those allegations are denied.**

135.    Each day BP violates either the 0.0075 lb/mmBtu or 4.28 lb/hr emissions limits is a separate violation of both the Indiana SIP and Whiting Refinery's Title V operating permit.

**ANSWER:    The law, Indiana SIP, and permit speak for themselves. To the extent paragraph 135 asserts allegations against Defendant, those allegations are denied.**

136.    Based on BP's stack test results and IDEM's findings, BP violated the Boiler emissions limits at Boiler 33 on each day from October 11, 2018, to the date of this filing. These violations are ongoing. ¶ 92(g).

**ANSWER:    Denied.**

Boiler 34

137.    Based on the total annual heat input and $PM_{10}$ emissions reported by BP in its annual Emission Statements, annual $PM_{10}$ emission rates for Boiler 34 averaged 0.0220 lb/mmBtu in calendar years 2016, 2017, and 2018. ¶ 108(d), ¶ 112(d).

**ANSWER:    Denied.**

138.    Alternatively, to the extent that Whiting Refinery's annual Emission Statements for 2016, 2017, and 2018 are meant to reflect an assumed emission rate of 0.010 lb/mmBtu, Boiler 34 failed to comply with the $PM_{10}$ limit of 0.0075 lb/mmBtu in those years ¶ 113.

**ANSWER:    Denied.**

139.    Based on credible evidence derived from BP's Emission Statements, BP violated the Boiler emissions limits at Boiler 34 on each day from January 1, 2016, until October 12, 2018. ¶ 108(d), ¶ 112(d).

**ANSWER:    Denied.**

140.    Based on the results of an October 12, 2018 stack test, IDEM determined that Boiler 34's compliance could not be determined for either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. Ex. 7, pgs. 4, 11-12; ¶ 92(h).

**ANSWER:    Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 140 asserts allegations against Defendant, those allegations are denied.**

141.    The emissions rates of 0.0114 lb/mmBtu and 7.375 lb/hour reported on October 12, 2018 exceed the Boiler emissions limits of 0.0075 lb/mmBtu and 4.28 lb/mmBtu. ¶ 116.

**ANSWER:    The stack test results speak for themselves. To the extent paragraph 141 asserts allegations against Defendant, those allegations are denied.**

142.    Each day BP violates either the 0.0075 lb/mmBtu or 4.28 lb/hr emissions limits is a separate violation of both the Indiana SIP and Whiting Refinery's Title V operating permit.

**ANSWER:    The law, Indiana SIP, and permit speak for themselves. To the extent paragraph 142 asserts allegations against Defendant, those allegations are denied.**

143.    Based on BP's stack test results, BP violated the Boiler emissions limits at Boiler 34 on each day from October 12, 2018, to the date of this filing. ¶ 92(h). These violations are ongoing.

**ANSWER:    Denied.**

<u>Boiler 36</u>

144.    Based on the results of an August 5, 2015 stack test, IDEM determined that Boiler 36 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. Ex. 8; ¶ 92(i).

**ANSWER:    Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 144 asserts allegations against Defendant, those allegations are denied.**

145.    Based on the results of an October 21, 2015 stack test, IDEM determined that Boiler 36 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. *See* October 21, 2015 Performance Test Report for Boiler 36 (excerpted) & corresponding IDEM Office of Air Quality Compliance Memorandum (July 25, 2016), Ex. 13, pgs. 1 & 4; ¶ 92(j).

**ANSWER:    Both the Performance Test Report and IDEM's compliance review speak for themselves. To the extent paragraph 145 asserts allegations against Defendant, those allegations are denied.**

146.    Based on the corrected results of 0.021 lb/mmBtu and 12.95 lb/hr for a November 2-3, 2016 stack test, IDEM determined that Boiler 36 failed to meet either the 0.0075 lb/mmBtu or the 4.28 lb/hr $PM_{10}$ emissions limits. Ex. 11, pgs. 2 & 5; ¶ 92(k).

**ANSWER:    Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 146 asserts allegations against Defendant, those allegations are denied.**

147.    Each day BP violates either the 0.0075 lb/mmBtu or 4.28 lb/hr emissions limits is a separate violation of both the Indiana SIP and Whiting Refinery's Title V operating permit.

**ANSWER:    The law, Indiana SIP, and permit speak for themselves. To the extent paragraph 147 asserts allegations against Defendant, those allegations are denied.**

148.    Based on BP's stack test results and IDEM's findings, BP violated the Boiler emissions limits at Boiler 36 on each day from August 5, 2015, to the date of this filing. ¶¶ 92(i) – 92(k). These violations are ongoing.

**ANSWER:    Denied.**

**COUNT II:  Violations of $PM_{10}$ Emissions limits at Stacks 503-01 through 503-05**

149.    BP's Title V permit for the Whiting Refinery requires BP to ensure that $PM_{10}$ emissions from each Stack 503-01 through 503-05 do not exceed an emissions rate of 0.010 lb/mmBtu. *See* 2018 Title V Permit, Section D.24.4(b)(2).

**ANSWER:    The permit speaks for itself. To the extent paragraph 149 asserts allegations against Defendant, those allegations are denied.**

Stack 503-01

150.    BP's October 8, 2018 stack test reported an average $PM_{10}$ emissions rate that exceeded the 0.010 lb/mmBtu Stack emissions limit, and IDEM confirmed that the test results demonstrated a failure to comply with that limit. Ex. 7, pgs. 1-2, 6; ¶ 92(a).

**ANSWER:     Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 150 asserts allegations against Defendant, those allegations are denied.**

151.    Based on BP's stack test results and IDEM's findings, BP violated the Stack emissions limit at Stack 503-01 on each day from October 8, 2018, to the date of this filing. These violations are ongoing. Ex. 7, pgs. 1-2, 6; ¶ 92(a).

**ANSWER:     Denied.**

<u>Stack 503-02</u>

152.    BP's August 3, 2015 stack test reported an average $PM_{10}$ emissions rate that exceeded the 0.010 lb/mmBtu Stack emissions limit, and IDEM confirmed that the test results demonstrated a failure to comply with that limit. Ex. 8; ¶ 92(b).

**ANSWER:     Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 152 asserts allegations against Defendant, those allegations are denied.**

153.    BP's October 20, 2015 stack test reported an average $PM_{10}$ emissions rate that exceeded the 0.010 lb/mmBtu Stack emissions limit, and IDEM confirmed that the test results demonstrated a failure to comply with that limit. Ex. 9, pgs. 1 & 4; ¶ 92(c).

**ANSWER:     Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 153 asserts allegations against Defendant, those allegations are denied.**

154.    BP's January 28, 2016 stack test reported an average $PM_{10}$ emissions rate that exceeded the 0.010 lb/mmBtu Stack emissions limit, and IDEM confirmed that the test results demonstrated a failure to comply with that limit. Ex. 10, pgs. 1 & 3; ¶ 92(d).

**ANSWER:    Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 154 asserts allegations against Defendant, those allegations are denied.**

155.    Based on a corrected result of 0.012 lb/mmBtu for the November 1-2, 2016 stack test, IDEM confirmed that the stack test results demonstrated a failure to comply with the 0.010 lb/mmBtu $PM_{10}$ emissions limit. Ex. 11, pgs. 1 & 4; ¶ 92(e).

**ANSWER:    Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 155 asserts allegations against Defendant, those allegations are denied.**

156.    BP's October 9, 2018 stack test reported an average $PM_{10}$ emissions rate that exceeded the 0.010 lb/mmBtu Stack emissions limit, and IDEM confirmed that the test results demonstrated a failure to comply with that limit. Ex. 7, pgs. 2 & 8; ¶ 92(f).

**ANSWER:    Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 156 asserts allegations against Defendant, those allegations are denied.**

157.    Based on BP's stack test results and IDEM's findings, BP violated the Stack emissions limit at Stack 503-02 on each day from August 3, 2015, to the date of this filing. These violations are ongoing. Ex. 7; Ex. 8; Ex. 9; Ex. 10; Ex. 11; ¶¶ 92(b) – 92(f).

**ANSWER:    Denied.**

<u>Stack 503-03</u>

158.    BP's October 11, 2018 stack test reported an average $PM_{10}$ emissions rate that exceeded the 0.010 lb/mmBtu Stack emissions limit, and IDEM confirmed that the test results demonstrated a failure to comply with that limit. *See* Ex. 7, pgs. 3 & 10; ¶ 92(g).

**ANSWER:   Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 158 asserts allegations against Defendant, those allegations are denied.**

159.   Based on BP's stack test results and IDEM's findings, BP violated the Stack emissions limit at Stack 503-03 on each day from October 11, 2018, to the date of this filing. These violations are ongoing. Ex. 7; ¶ 92(g).

**ANSWER:   Denied.**

<u>Stack 503-04</u>

160.   BP's October 12, 2018 stack test reported an average $PM_{10}$ emissions rate that exceeded the 0.010 lb/mmBtu Stack emissions limit, and IDEM confirmed that the test results demonstrated a failure to comply with that limit. *See* Ex. 7, pgs. 4 & 12; ¶ 92(h).

**ANSWER:   Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 160 asserts allegations against Defendant, those allegations are denied.**

161.   Based on BP's stack test results and IDEM's findings, BP violated the Stack emissions limit at Stack 503-04 on each day from October 11, 2018, to the date of this filing. These violations are ongoing. Ex. 7; ¶ 92(h).

**ANSWER:   Denied.**

<u>Stack 503-05</u>

162.   BP's August 5, 2015 stack test reported an average $PM_{10}$ emissions rate that exceeded the 0.010 lb/mmBtu Stack emissions limit, and IDEM confirmed that the test results demonstrated a failure to comply with that limit. Ex. 8; ¶ 92(i).

**ANSWER:     Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 162 asserts allegations against Defendant, those allegations are denied.**

163.    BP's October 21, 2015 stack test reported an average $PM_{10}$ emissions rate that exceeded the 0.010 lb/mmBtu Stack emissions limit, and IDEM confirmed that the test results demonstrated a failure to comply with that limit. Ex. 13, pgs. 1 & 4; ¶ 92(j).

**ANSWER:     Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 163 asserts allegations against Defendant, those allegations are denied.**

164.    Based on a corrected result of 0.021 lb/mmBtu for the November 2-3, 2016 stack test, IDEM confirmed that the stack test results demonstrated a failure to comply with the 0.010 lb/mmBtu $PM_{10}$ emissions limit. Ex. 11, pgs. 2 & 5; ¶ 92(k).

**ANSWER:     Both the stack test results and IDEM's compliance review speak for themselves. To the extent paragraph 164 asserts allegations against Defendant, those allegations are denied.**

165.    On April 16, 2019, BP's stack test for Stack 503-05 recorded an average $PM_{10}$ emissions rate of 0.0109 lb/mmBtu. April 16, 2019 Performance Test Report for Boiler 36 (excerpted), Ex. 14; ¶ 92(l).

**ANSWER:     The stack test results speak for themselves. To the extent paragraph 165 asserts allegations against Defendant, those allegations are denied.**

166.    The rate of 0.0109 lb/mmBtu reported on the April 16, 2019 stack test exceeds the Stack emissions limit of 0.010 lb/mmBtu. ¶ 149.

**ANSWER:   The stack test results speak for themselves. To the extent paragraph 166 asserts allegations against Defendant, those allegations are denied.**

167.   Based on BP's stack test results and IDEM's findings, BP violated the Stack emissions limit at Stack 503-05 on each day from August 5, 2015, to the date of this filing. These violations are ongoing. Ex. 8; Ex. 11; Ex. 13; Ex. 14; ¶¶ 92(i) – 92(l).

**ANSWER:   Denied.**

### COUNT III:  Violations of the Requirement to Retest Within 180 Days of Each Stack Test Failure at Stacks 503-01 through 503-05

168.   BP's Title V permit for the Whiting Refinery requires BP to perform a retest and demonstrate compliance no later than 180 days after the date of any test failing to demonstrate compliance with an applicable emissions limitation. *See* 2018 Title V Permit, Section C.19(b); *see also* Ex. 8, pg. 2 ("Please note Section C.19 in your T089-35729-00453 Operating Permit… requires a retest to demonstrate compliance shall be performed no later than one hundred eighty (180) days after the date of the test.").

**ANSWER:   The permit speaks for itself. To the extent paragraph 168 asserts allegations against Defendant, those allegations are denied.**

### Stack 503-01

169.   BP was required to perform a retest to demonstrate compliance at Stack 503-01 by April 6, 2019, no later than 180 days after the failed October 8, 2018 stack test.

**ANSWER:   The law, stack test results, and permit speak for themselves. To the extent paragraph 169 asserts allegations against Defendant, those allegations are denied.**

170.   BP violated the requirement to retest at Stack 503-01 on each day from April, 2019, to the date of this filing. These violations are ongoing.

**ANSWER:   Denied.**

<u>Stack 503-02</u>

171.    BP was required to perform a retest to demonstrate compliance at Stack 503-02 by July 26, 2016, no later than 180 days after the failed January 28, 2016 stack test.

**ANSWER:    The law, stack test results, and permit speak for themselves. To the extent paragraph 171 asserts allegations against Defendant, those allegations are denied.**

172.    BP violated the requirement to retest at Stack 503-02 on each day from July 27, 2016 to November 1, 2016.

**ANSWER:    Denied.**

173.    BP was required to perform a retest to demonstrate compliance at Stack 503-02 by May 1, 2017, no later than 180 days after the failed November 1-2 stack test.

**ANSWER:    The law, stack test results, and permit speak for themselves. To the extent paragraph 173 asserts allegations against Defendant, those allegations are denied.**

174.    BP violated the requirement to retest at Stack 503-02 on each day from May 2, 2017 to October 9, 2018.

**ANSWER:    Denied.**

175.    BP was required to perform a retest to demonstrate compliance at Stack 503-02 by April 7, 2019, no later than 180 days after the failed October 9, 2018 stack test.

**ANSWER:    The law, stack test results, and permit speak for themselves. To the extent paragraph 175 asserts allegations against Defendant, those allegations are denied.**

176.    BP violated the requirement to retest at Stack 503-02 on each day from April 8, 2019, to the date of this filing. These violations are ongoing.

**ANSWER:    Denied.**

<u>Stack 503-03</u>

177.    BP was required to perform a retest to demonstrate compliance at Stack 503-03 by April 9, 2019, no later than 180 days after the failed October 11, 2018 stack test.

**ANSWER:    The law, stack test results, and permit speak for themselves. To the extent paragraph 177 asserts allegations against Defendant, those allegations are denied.**

178.    BP violated the requirement to retest at Stack 503-03 on each day from April 10, 2019, to the date of this filing. These violations are ongoing.

**ANSWER:    Denied.**

<u>Stack 503-04</u>

179.    BP was required to perform a retest to demonstrate compliance at Stack 503-04 by April 10, 2019, no later than 180 days after the failed October 12, 2018 stack test.

**ANSWER:    The law, stack test results, and permit speak for themselves. To the extent paragraph 179 asserts allegations against Defendant, those allegations are denied.**

180.    BP violated the requirement to retest at Stack 503-04 on each day from April 11, 2019, to the date of this filing. These violations are ongoing.

**ANSWER:    Denied.**

<u>Stack 503-05</u>

181.    BP was required to perform a retest to demonstrate compliance at Stack 503-05 by April 18, 2016, no later than 180 days after the failed October 21, 2015 stack test.

**ANSWER:    The law, stack test results, and permit speak for themselves. To the extent paragraph 181 asserts allegations against Defendant, those allegations are denied.**

182.    BP violated the requirement to retest at Stack 503-05 on each day from April 19, 2016, to November 2, 2016.

**ANSWER:    Denied.**

183.    BP was required to perform a retest to demonstrate compliance at Stack 503-05 by May 2, 2017, no later than 180 days after the failed November 2-3, 2016 stack test.

**ANSWER:    The law, stack test results, and permit speak for themselves. To the extent paragraph 183 asserts allegations against Defendant, those allegations are denied.**

184.    BP violated the requirement to retest at Stack 503-05 on each day from May 3, 2017, to April 16, 2019.

**ANSWER:    Denied.**

**Summary of Violations Alleged**

185.    All of BP's alleged violations of the Clean Air Act are itemized by applicable requirement in Tables 4, 5, and 6 below; each row is itemized as ¶¶ 186 - 216 of this Complaint.

**ANSWER:    Paragraph 185 purports to reassert allegations against Defendant. Defendant incorporates all previous Answers as if fully set forth in Paragraphs 1-185 and denies the summary of the allegations in Paragraphs 186-216 (Tables 4, 5, and 6) below.**

**Table 4**
**Summary of Boiler $PM_{10}$ Emissions Limitations Violations**

| ¶ | Applicable Requirement | Unit | Evidence of Violations | Violations Start Date | Violations End Date | Total Days |
|---|---|---|---|---|---|---|
| 186 | | Boiler 31 | 2016-2018 Emissions Statements, ¶ 108(a), ¶ 112(a), ¶ 113 | 1/1/2016 | 10/8/2018 | 1,011 |
| 187 | | Boiler 31 | 10/8/2018 Stack Test & IDEM finding of noncompliance, ¶ 92(a) | 10/8/2018 | Ongoing | 333 |
| 188 | 326 IAC 6.8-2-6(a) | Boiler 32 | Stack Tests & IDEM findings of noncompliance, ¶¶ 92(b)–(e) | 8/3/2015 | 10/10/2017 | 799 |
| 189 | | Boiler 32 | 10/9/2018 Stack Test & IDEM finding of noncompliance, ¶ 92(f) | 10/9/2018 | Ongoing | 332 |
| 190 | 0.0075 lb/mmBtu and 4.28 lb/hr Boiler Emissions Limitations | Boiler 33 | 2016-2018 Emissions Statements, ¶ 108(c), ¶ 112(c), ¶ 113 | 1/1/2016 | 10/11/2018 | 1,014 |
| 191 | | Boiler 33 | 10/11/2018 Stack Test & 2018 Emission Statement, ¶ 92(g) | 10/11/2018 | Ongoing | 330 |
| 192 | | Boiler 34 | 2016-2018 Emissions Statements, ¶ 108(d), ¶ 112(d), ¶ 113 | 1/1/2016 | 10/12/2018 | 1,015 |

| 193 | | Boiler 34 | 10/12/2018 Stack Test & IDEM finding of noncompliance, ¶ 92(h) | 10/12/2018 | Ongoing | 329 |
|---|---|---|---|---|---|---|
| 194 | | Boiler 36 | Stack Tests & IDEM findings of noncompliance, ¶¶ 92(i)-(k) | 8/5/2015 | Ongoing | 1,493 |
| 195 | 2018 Title V Permit, Section D.24.1 | Boiler 31 | 2016-2018 Emissions Statements, ¶ 108(a), ¶ 112(a), ¶ 113 | 1/1/2016 | 10/8/2018 | 1,011 |
| 196 | | Boiler 31 | 10/8/2018 Stack Test & IDEM finding of noncompliance, ¶ 92(a) | 10/8/2018 | Ongoing | 333 |
| 197 | | Boiler 32 | Stack Tests & IDEM findings of noncompliance, ¶¶ 92(b)–(e) | 8/3/2015 | 10/10/2017 | 799 |
| 198 | | Boiler 32 | 10/9/2018 Stack Test & IDEM finding of noncompliance, ¶ 92(f) | 10/9/2018 | Ongoing | 332 |
| 199 | 0.0075 lb/mmBtu and 4.28 lb/hr Boiler Emissions Limitations | Boiler 33 | 2016-2018 Emissions Statements, ¶ 108(c), ¶ 112(c), ¶ 113 | 1/1/2016 | 10/11/2018 | 1,014 |
| 200 | | Boiler 33 | 10/11/2018 Stack Test & 2018 Emission Statement, ¶ 92(g) | 10/11/2018 | Ongoing | 330 |
| 201 | | Boiler 34 | 2016-2018 Emissions Statements, ¶ 108(d), ¶ 112(d), ¶ 113 | 1/1/2016 | 10/12/2018 | 1,015 |
| 202 | | Boiler 34 | 10/12/2018 Stack Test & IDEM finding of noncompliance, ¶ 92(h) | 10/12/2018 | Ongoing | 329 |

**Table 5**
**Summary of Stack PM$_{10}$ Emissions Limitations Violations**

| ¶ | Applicable Requirement | Unit | Evidence of Violations | Violations Start Date | Violations End Date | Total Days |
|---|---|---|---|---|---|---|
| 204 | 2018 Title V Permit, Section D.24.4(b)(2)  0.010 lb/mmBtu Stack Emissions limit | Stack 503-01 | 10/8/2018 Stack Test & IDEM finding of noncompliance, ¶ 92(a) | 10/8/2018 | Ongoing | 324 |
| 205 | | Stack 503-02 | Stack Tests & IDEM findings of noncompliance, ¶¶ 92(b)–(f) | 8/3/2015 | Ongoing | 1,486 |
| 206 | | Stack 503-03 | 10/11/2018 Stack Test & 2018 Emission Statement, ¶ 92(g) | 10/11/2018 | Ongoing | 321 |
| 207 | | Stack 503-04 | 10/12/2018 Stack Test & IDEM finding of noncompliance, ¶ 92(h) | 10/12/2018 | Ongoing | 320 |
| 208 | | Stack 503-06 | Stack Tests & IDEM findings of noncompliance, ¶¶ 92(i)-(l) | 8/5/2015 | Ongoing | 1,484 |

**Table 6**
**Summary of Requirement to Retest Violations**

| ¶ | Applicable Requirement | Unit | Violations Start Date | Violations End Date | Total Days Of Violation |
|---|---|---|---|---|---|
| 209 | | Stack 503-01 | 4/7/2019 | Ongoing | 152 |
| 210 | | Stack 503-02 | 7/27/2016 | 11/1/2016 | 97 |
| 211 | | Stack 503-02 | 5/2/2017 | 10/9/2018 | 525 |
| 212 | 2018 Title V Permit Section C.19 | Stack 503-02 | 4/8/2019 | Ongoing | 151 |
| 213 | | Stack 503-03 | 4/10/2019 | Ongoing | 149 |
| 214 | | Stack 503-04 | 4/11/2019 | Ongoing | 148 |
| 215 | | Stack 503-05 | 4/19/2016 | 11/2/2016 | 197 |
| 216 | | Stack 503-05 | 5/3/2017 | 4/16/2019 | 713 |

## AFFIRMATIVE DEFENSES

1.     The authorized state agency, the Indiana Department of Environmental Management ("IDEM"), has primary jurisdiction and is addressing the issues raised in this Complaint.

2.     The Court should bar this lawsuit and abstain as the issues being raised are being addressed by IDEM, and federal court actions would be disruptive to IDEM's efforts.

3.     This Complaint should be barred under 42 U.S.C. § 7604(b)(1)(B) as the state is diligently prosecuting enforcement in the applicable venue.

4.     Some or all of Plaintiff's claims should be barred as Plaintiff's use of the credible evidence rule is not appropriate because it is being relied upon outside the context of the referenced test methods.

5.     Some or all of Plaintiff's claims should be barred because the referenced test methods produce biased results overstating $PM_{10}$ condensable emissions.

6.      Some or all of Plaintiff's claims should be barred because they rely on agency guidance and not settled sources of law.

7.      Some or all of Plaintiff's claims should be dismissed because they rely on IDEM staff informal and incorrect conclusions.

8.      To the extent that the Complaint's claims compare the Boiler limits to the emissions from the stack, those claims should be dismissed because the Boiler limits apply only to the emissions from the Boilers themselves, not to other emission sources in the stack (such as the SCRs).

9.      To the extent that the Complaint's claims suggest that the applicable limits reflect not-to-exceed values, those claims should be disregarded as the limits are framed in the context of the referenced test methods, including the averaging period (3-hour average for $PM_{10}$ limits).

**PRAYER FOR RELIEF**

BP Products North America Inc. respectfully requests that the Court enter judgment in favor of BP Products North America Inc. against Plaintiff for its equitable share of any damages in an amount to be determined at trial, plus interest, and all other just and proper relief.

Respectfully submitted,

  s/  *E. Sean Griggs*

E. Sean Griggs (17716-49)
**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, Indiana  46204
sean.griggs@btlaw.com
Direct Line:  (317) 231-7793
Facsimile:  (317) 231-7433

DMS ESG 15257474